```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KRISTIAN E. WARNER,
BENJAMIN F. WARNER,
ANDREW M. WARNER, and
MONROE P. WARNER,


               Plaintiffs,


v.                              //   CIVIL ACTION NO. 1:10CV54
                                     CIVIL ACTION NO. 1:10CV55
                                          (Judge Keeley)


DANIEL BOROFF,
Individually and in his
capacity as City
Manager of the City
of Morgantown,

DAVID FETTY,
Individually and in his
capacity as Fire Chief
of the City of Morgantown,

KENNETH TENNANT,
Individually and in his
capacity as Chief Fire Marshal
of the City of Morgantown,

PATRICK PICKENPAUGH,
Individually and in his
capacity as Deputy Fire Marshal
of the City of Morgantown,

JASON QUINN,
Individually and in his
capacity as Deputy Fire Marshal
of the City of Morgantown,

TERRY HOUGH,
Individually and in her
capacity as City Engineer
of the City of Morgantown,
```

**MICHAEL STONE,**
**Individually and in his**
**capacity as Chief Code**
**Enforcement Officer of**
**the City of Morgantown,**

**DAVID FRIEND,**
**Individually and in his**
**capacity as Code**
**Enforcement Officer of**
**the City of Morgantown, and**

**TYE POLING,**
**Individually and in his**
**former capacity as Code**
**Enforcement Officer of**
**the City of Morgantown**

**Defendants.**

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT [DKT NO. 105]**

Pending before the Court is the defendants' motion for summary judgment (dkt. no. 105) as to the individual plaintiffs' claims of intentional infliction of emotional distress ("outrage") against the individual defendants. For the reasons that follow, the Court **GRANTS** the defendants' motion and **DISMISSES** the plaintiffs' claims **WITH PREJUDICE.**

## I. Procedural Background

On March 3, 2010, the plaintiffs, Kristian, Benjamin, Andrew, and Monroe Warner ("the Warners"), McCoy 6 Apartments, LLC ("McCoy 6"), and Augusta, LLC ("Augusta"), filed an adversary complaint in bankruptcy proceedings involving the debtors, McCoy 6 and Augusta,

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]

alleging ten causes of action against the City of Morgantown ("the City") and nine individual city officials. The Bankruptcy Court transferred the adversary complaint to this Court on April 5, 2010. Thereafter, on March 29, 2011, the defendants moved to dismiss all counts in the complaint. After due consideration of the issues raised in the defendants' motion, the Court dismissed Counts One (substantive due process), Four (abuse of process), Five (procedural due process), Seven (negligence), and Nine (negligent misrepresentation) against all the defendants, and dismissed the claims of outrage of McCoy 6 and Augusta against the defendants in Count Eight. (Dkt. No. 39). However, it allowed the Warners' claims of outrage in that count to survive as to the individual defendants. It also dismissed the Warners' claims of equal protection and inverse condemnation in Counts Two and Six, but allowed the claims of Mcoy 6 in that regard to remain.

On September 24, 2012, the defendants moved for summary judgment as to these remaining claims. (Dkt. No. 105). On October 29, 2012, the Court orally dismissed the individual Warners' claim of outrage against the City. (Dkt. No. 154). See W. Va. Code § 29-12A-4; Poe v. Town of Gilbert, No. 2:11-CV-00645, 2012 WL 3853200, *8 (S.D. W. Va. Sept. 5, 2012) ("Political

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

subdivisions are not, however, liable for intentional malfeasance
on the part of their employees.").[1] On December 14, 2012, during
oral argument on the defendants' motion for summary judgment, the
parties stipulated to the dismissal of the claims of McCoy 6 in
Counts Two and Six. (Dkt. No. 164). Thus, the only surviving claim
in this case is the Warners' claim of outrage against each of the
individual defendants, to which the Court now turns.

## II. Factual Background

This action arises from a series of building and fire code
enforcement actions taken by the City and certain of its employees
against the Warners in their roles as member-managers of McCoy 6
and Augusta.

The Warners were the sole members of McCoy 6, which had been
in the business of renting houses and apartments to students of
West Virginia University ("WVU") in Morgantown, West Virginia since
1979. Complaint at ¶ 25, 27. In 1994, McCoy 6 constructed
Mountaineer Court, a 32-unit student-housing complex. In 2007,
Augusta, which also was solely owned by the Warners, constructed

---

[1]     Also on October 29, 2012, the Court granted the plaintiffs' oral
motion to dismiss the defendants' Motion to Alter Judgment, Motion to
Expunge Lis Pendens. (Dkt. No. 109).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

The Augusta, a 158-unit student-housing complex. Complaint at ¶ 26, 27.

**A.**

The Warners contend that their problems with the City and the individual defendants arose during the construction of The Augusta. They maintain that City officials were unprepared to deal with a project of The Augusta's size, and that their inexperience prolonged construction of the building by nearly two months, from June until August, 2007. (Complaint at ¶ 30; Dkt. No. 112 at 4; Dkt. No. 105-2 at 7; Dkt. No. 114 at 5-6).

Further complicating matters, Chief Fire Marshal Max Humphries ("Humphries"), who had reviewed and approved plans for The Augusta (dkt. no. 114 at 7), retired in December 2006, just as construction on that project got underway. (Complaint at ¶ 31). The complaint alleges that Humphries' replacement, defendant Chief Fire Marshal Kenneth Tennant ("Tennant"), together with defendant Fire Chief David Fetty ("Fetty") and other city fire and building code enforcement officials, used Humphries' retirement as an opportunity to launch a retaliatory campaign against the Warners, including a demand for last minute changes that delayed the opening of The

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

Augusta past the first day of WVU's fall semester. (Dkt. No. 114 at 6).

While Andrew Warner described the delays as part of "some beef" on the part of Fetty and defendant City Engineer Terry Hough ("Hough"), he identified no motivation for that animosity beyond a general practice by the City to "squeeze landlords." (Dkt. No. 114 at 4,6). Moreover, the Warners do not allege that any of the changes and additions required by City officials were illegal. In his deposition, William Graham ("Graham"), a former member of the City Fire Department, recalled Tennant's statement to fire officials that The Augusta violated applicable fire codes, and should be vacated and demolished. (Dkt. No. 119 at 3). Despite Tennant's opinion, The Augusta opened in time for the start of the 2007 fall semester at WVU. The Warners, however, incurred unforseen costs due to the delayed opening and their obligation to provide alternative housing for tenants whose leases permitted them to move into The Augusta before the semester began. (Dkt. No. 112 at 5).

**B.**

The Warners allege that their timely completion of The Augusta angered and embarrassed the individual defendants, who then formed a plan to retaliate against the Warners individually, through their

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

limited liability company, McCoy 6, and its holdings, particularly
Mountaineer Court. (Complaint at ¶ 37). They allege the individual
defendants abused their discretion in the enforcement of building
and fire codes in a coordinated and concerted effort to deprive
them of Mountaineer Court, and, ultimately, to drive them into
bankruptcy. Id. According to the Warners, this plan of retaliation
commenced in February and March of 2008, when Building Code
Enforcement Officers, defendant Tye Poling ("Poling") and Kathy
Stiles ("Stiles") (who is not a party to this suit) conducted a
series of three inspections of Mountaineer Court that disclosed
several building code violations. (Dkt. No. 105-2 at 21, 30-32).

Although the Warners corrected the violations cited in the
February 28 and March 11, 2008 reports of Poling and Stiles, they
did not correct the violations cited in the March 12, 2008 report.[2]
(Dkt. No. 105-2 at 21, 30-32). Furthermore, on June 17, 2008,
another building code enforcement officer, Bonita Forbes ("Forbes")
(who is not a party to this litigation) inspected Mountaineer Court
again and issued a citation for additional building code
violations, including rotted wooden components of the building's

---

[2]     Nearly every cited violation on the February 28 and March 11,
2008 inspection reports are checked off, while there are not check-
marks on the March 12, 2008 inspection report.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

exterior walkways. (Dkt. No. 105-2 at 34). The citations issued by
Poling, Stiles, and Forbes in February, March, and June advised
McCoy 6 that it had twenty (20) days to correct or appeal the
violations. (Dkt. No. 105-2 at 30-32, 34). The Warners, however,
never appealed any of the citations.

On December 8, 2008, while work was continuing on the walkway
violations Forbes had cited in June, Building Code Enforcement
Officers, defendant David Friend ("Friend") and Richard Powell
("Powell") (not a party to this litigation), issued a stop-work
order for renovations to the walkways. As reasons for their action,
Friend and Powell stated that the City had not yet received a
specific drawing of the deck supports, and that a joist had been
installed incorrectly. (Dkt. No. 105-2 at 40, 57). The Warners
maintain they had submitted the deck support drawings two months
earlier. (Dkt. No. 111 at 21; Dkt. No. 140 at 4). Friend lifted the
stay order after Donald Dempsey ("Dempsey"), the Warners'
construction manager, agreed to correct certain problems at
Mountaineer Court. (Dkt. No. 105-2 at 41).

The City maintains separate building and fire code inspection
processes. (Dkt. No. 105-2 at 94) (indicating that the fire and
building code inspections are conducted by separate departments).

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]

During the time the Warners were dealing with multiple building code violations at Mountaineer Court throughout 2008, they were facing the scrutiny of City fire officials as well. Acting on an alert from a City official, defendant Deputy Fire Marshal Patrick Pickenpaugh ("Pickenpaugh") conducted a walk-through inspection of Mountaineer Court on June 17, 2008 (dkt. no. 105-2 at 69, 75). Two days later, he issued a "Fire and Life Safety Warning Notification" (dkt. no. 105-2 at 78) and a "Notice of Violations" to McCoy 6. (Dkt. No. 105-2 at 75, 80-82). This notice listed 229 violations of the City's fire code at Mountaineer Court, and gave McCoy 6 until June 27, 2008 to submit a written corrective action plan for approval. It also stated that failure to comply with the order would lead to criminal prosecution of the property owner or manager, or condemnation of the property. (Dkt. No. 105-2 at 82).

When he had not received a corrective action plan from McCoy 6 as of July 11, 2008, (dkt. no. 105-2 at 70), Pickenpaugh issued an immediate danger evacuation order due to "an immediate danger that could reasonably be expected to cause death, serious physical harm, or serious property damage" at Mountaineer Court. (Dkt. No. 105-2 at 70, 84, 86). He also cited Benjamin Warner personally for the fire code violations at the complex. (Dkt. No. 141 at 5-11; Dkt.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

No. 105-2 at 84 (evacuation order stating that "[a] citation for violation of the current fire code will be issued for this life safety violation")). Benjamin Warner later pleaded "no contest" to at least one of the citations. (Dkt. No. 105-2 at 88). The record does not disclose whether he ever pleaded to, challenged, or appealed any of the remaining citations.[3] The Warners now complain that Pickenpaugh violated West Virginia Code § 29-3-16 because he gave them only twenty-four days, not the statutory thirty days, to comply with the citations.

Eighteen days after Pickenpaugh condemned Mountaineer Court, Dempsey finally submitted McCoy 6's "Written Plan of Corrective Action" to the Fire Marshal on July 29. (Dkt. No. 105-2 at 90). Nine days later, on August 7, Deputy City Fire Marshal T.A. Rhinehart lifted the condemnation order and Dempsey received a "Plan Review Document" notifying him that the plans submitted on

---

[3]    The Warners contend there was no meaningful appeal available to them. (Dkt. No. 111 at 4). That bare contention, however, does not negate the fact that they never challenged the citations in any official way, nor does the record support this assertion. (Dkt. No. 130 at 4) (deposition testimony of City Manager Boroff in which he states that the state fire marshal is the "ultimate authority" and the Fire Prevention Board "actually predated some of the arrangements in the state fire code"); (Dkt. No. 136 at 1 – 7) (deposition testimony of Fetty, in which he does not mention the Fire Prevention Board) (Dkt. No. 136 at 9-12) (deposition testimony of Graham, in which he does not mention the Fire Prevention Board).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

July 29, 2008 (including the removal and reconstruction of exterior walkways) were approved subject to additional code requirements, and that failure to meet the deadlines set forth in those plans could result in another condemnation. (Dkt. No. 105-2 at 96-99).

Construction schedules maintained in the office of the City Fire Marshal reflect that, subsequent to this approval, Dempsey submitted a series of requests for extensions for various phases of the corrective action plan. (Dkt. No. 127 at 2-16). Based on these schedules, ongoing remediation work at Mountaineer Court was to be completed by March 9, 2009. (Dkt. No. 127 at 12). Other components of the job, however, carried earlier completion dates. (Dkt. No. 127 at 2-16; Dkt. No. 142 at 6). For example, the exterior dry pipes at Mountaineer Court were to be installed by December 26, 2008. (Dkt. No. 127 at 4; Dkt. No. 142 at 6). The Warners characterize these completion dates as merely their engineer's estimate, not a binding schedule. (Dkt. No. 111 at 9).

To finance the remediation at Mountaineer Court, the Warners sought a $2.4 million line of credit from First United Bank. (Complaint at ¶ 77; Dkt. No. 114 at 10). On December 19, 2008, Andrew Warner notified defendant City Manager Dan Boroff ("Boroff") that he had obtained the line of credit, (dkt. no. 114 at 10), but

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

that notice apparently came too late to prevent certain events that resulted in McCoy 6's default on the mortgage held by Fifth/Third Bank and secured by Mountaineer Court. (Dkt. No. 142 at 9).

On December 19, 2008, Bridget Zeigler ("Zeigler"), an officer of Fifth/Third Bank, met with three representatives of the City, likely including City Engineer Hough (dkt. no. 124 at 7, 9; dkt. no. 135 at 5), to discuss the status of Mountaineer Court and the improvements necessary to avoid a second condemnation of the complex. (Dkt. No. 124 at 6). Zeigler later stated that she left the meeting with the impression that "city officials . . . wanted the improvements in the control of someone else." (Dkt. No. 124 at 7).

Also on December 19, Tennant sent a memo to City Manager Boroff to inform him that the City Fire Department would only sign off on a new timeline for repairs at Mountaineer Court if it received a "letter from the bank/financial institution documenting their acquisition of control submitted by December 26, 2008." (Dkt. No. 125 at 2). In deposition testimony, City employees characterized that requirement as "guaranteeing that something was going to be done at the site" (dkt. no. 135 at 7), or "find[ing] out who controlled the property so we knew who to deal with

regarding an extension" (dkt. no. 136 at 6), or determining if the Warners had the "financial wherewithal" to make the necessary repairs. (Dkt. No. 130 at 5).

The Warners contend these explanations are pretextual. They assert that City officials well knew Dempsey was their contact for the renovations at Mountaineer Court, and they simply wanted to divest the Warners of control and ownership. In support of this assertion, they point to Graham's testimony that, in his twenty-seven years with the City Fire Department, he had never seen a demand for change of ownership or control as a requirement for re-occupancy. (Dkt. No. 136 at 11).

Subsequently, on December 23, 2008, Zeigler and the Warners executed a conditional forbearance agreement and provisional receivership order providing for the appointment of a receiver for Mountaineer Court in the event more than five units of the complex were condemned. (Dkt. No. 142 at 13). Zeigler also wrote to the City on December 23 requesting an extension of two looming remediation deadlines – the December 26th deadline for installation of the dry pipe system, and the December 29th deadline for exterior walkway reconstruction. (Dkt. No. 142 at 6). Although the Fire Marshal's Office received this request on December 29, 2008 (dkt.

no. 105-3 at 5), Pickenpaugh and Poling reinspected Mountaineer Court that same day. (Dkt. No. 114 at 10).

Two problems arose during that inspection. First, according to Andrew Warner, Pickenpaugh told the Warners that a six-inch joist, which had previously been approved and installed, was insufficient and that "new construction requirements" mandated a ten-inch joist. Id. Second, the inspectors noticed that four splice plates, a safety measure used where joists are joined, were missing. Id. Although Andrew Warner told the inspectors the plates were on order and would be installed as soon as they arrived, id., the inspectors refused to wait. Pickenpaugh issued a misdemeanor complaint to McCoy 6 for failing to comply with written notices of violations of the fire code at Mountaineer Court (dkt. no. 105-3 at 7) and condemned the building for a second time (dkt. no. 105-3 at 10).

That action triggered the receivership clause in the Warners' forbearance agreement with Fifth/Third Bank. Importantly, at least one defendant, City Manager Boroff, was aware that, if Mountaineer Court was condemned again and went into receivership, the Warners would face bankruptcy. (Dkt. No. 130 at 8). Ultimately, McCoy 6 filed for bankruptcy on February 2, 2009, and Augusta followed suit a year later, on February 19, 2010.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]

Pickenpaugh maintains that the second condemnation of Mountaineer Court stemmed from the failure of McCoy 6 to comply with previous written notices of fire code violations and the lack of progress at the work site. (Dkt. No. 105-2 at 72). In addition, he stated that Mountaineer Court had only one set of stairs and the dry pipe sprinkler system had not yet been installed. (Dkt. No. 133 at 8). Zeigler, however, stated that, as of December 29, 2008, the Warners were getting the work done to bring Mountaineer Court up to code. (Dkt. No. 124 at 5, 8).

### C.

Following the second condemnation of Mountaineer Court on December 29, 2008, Fifth/Third Bank appointed Mark Nesselroad, ("Nesselroad"), who is not a party to this lawsuit, as receiver to oversee completion of the work at the complex. (Dkt. No. 105-3 at 13-14). The Warners contend that Nesselroad's appointment evinces the intent of the individual defendants to divest them of Mountaineer Court. Although the Warners wanted Dempsey or Mike Castle, another local developer, appointed, unnamed City officials allegedly opposed those choices. Id. Boroff initially testified that Nesselroad never contacted him about becoming the receiver for Mountaineer Court, but he later recanted, acknowledging that

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

Nesselroad had in fact contacted him seeking a reference for the receiver position. (Dkt. No. 130 at 8, 9).

Despite the financial upheaval, Dempsey acknowledged that work on Mountaineer Court proceeded at an accelerated pace under Nesselroad. (Dkt. No. 105-2 at 16, 17). And Friend testified that "[the receiver] did more work in eight or nine days than the other contractor did in two months." (Dkt. No. 105-2 at 43). As a result, City officials issued a temporary certificate of occupancy for Mountaineer Court on or about January 9, 2009. (Dkt. No. 137 at 6).

The Warners claim that City officials never enforced the building and fire codes as strictly against Nesselroad and subsequent owners of Mountaineer Court as they had done against them. In support of their contention, they point to the fact that, while Pickenpaugh required them to install four splice plates, Friend later determined those plates were unnecessary after Mountaineer Court came under Nesselroad's control. (Dkt. No. 137 at 4).

The Warners also question how the receiver could have earned a temporary certificate of occupancy so quickly even though code violations persisted at Mountaineer Court. (Dkt. No. 137 at 10). When Friend was asked why he had not condemned the property for

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

building code violations while in the receiver's hands, he responded, "I can't answer that." (Id. at 5). Pickenpaugh, moreover, acknowledged that, to this day, Mountaineer Court has yet to achieve a permanent certificate of occupancy. (Dkt. No. 133 at 11).

### III. Summary Judgment Standard

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(1)(A), (a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment; the evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. Anderson, 477 U.S. at 248-52. In other words, "[m]ere speculation by the non-movant cannot create a genuine issue of material fact." JKC Holding Co. LLC v. Washington Sports

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

Ventures, Inc., 234 F.3d 459 (4th Cir. 2001) (citing Cox v. County
of Prince William, 249 F.3d 295, 299 (4th Cir. 2001)).

In applying the standard for summary judgment, the Court must
view any inferences permissibly drawn from the underlying facts in
review in the light most favorable to the non-movant. Matsushita
Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88
(1986). "However, such inferences must 'fall within the range of
reasonable probability and not be so tenuous as to amount to
speculation or conjecture.'" JKC Holding Co. LLC, 234 F.3d at 465
(citing Thompson Everett, Inc. v. National Cable Advert., L.P., 57
F.3d 1317, 1323 (4th Cir. 1995)). The Court must avoid weighing the
evidence or determining the truth and limit its inquiry solely to
a determination of whether genuine issues of triable fact exist.
Anderson, 477 U.S. at 248.

### IV. Discussion

Pursuant to Travis v. Alcon Laboratories, Inc., 504 S.E.2d
419, 425 (W. Va. 1998), in order to state a claim of outrage, the
Warners must meet the following four elements:

> (1) that the defendant's conduct was atrocious,
> intolerable, and so extreme and outrageous as to exceed
> the bounds of decency; (2) that the defendant acted with
> the intent to inflict emotional distress, or acted
> recklessly when it was certain or substantially certain

emotional distress would result from his conduct; (3)
that the actions of the defendant caused the plaintiff to
suffer emotional distress; and (4) that the emotional
distress suffered by the plaintiff was so severe that no
reasonable person could be expected to endure it.

Travis borrowed these elements from the Restatement (Second)

of Torts § 46(1) (1965) ("Restatement (2d)"), where the first

element, outrageous conduct, is defined as conduct

> so outrageous in character, and so extreme in degree, as
> to go beyond all possible bounds of decency, and to be
> regarded as atrocious, and utterly intolerable in a
> civilized community. Generally, the case is one in which
> the recitation of the facts to an average member of the
> community would arouse his resentment against the actor,
> and lead him to exclaim, "Outrageous!"

Id. comment (d). Comment (d) further states:

> It has not been enough that the defendant has acted with
> an intent which is tortious or even criminal, or that he
> has intended to inflict emotional distress, or even that
> his conduct has been characterized by "malice," or a
> degree of aggravation which would entitle the plaintiff
> to punitive damages for another tort.

Id.

In cases of outrage, courts demand "strict proof of

unprecedented and extreme misconduct." Tanner v. Rite Aid of West

Virginia, Inc., 461 S.E.2d 149, 157 (W. Va. 1995) (citing Keyes v.

Keyes, 392 S.E.2d 693, 696 (W. Va. 1990)). Only a few courts have

held that a plaintiff's claim of outrage meets the "extreme and

outrageous" standard under West Virginia law. Garrett v. Viacom,

Inc., No. 1:03CV22, 2003 WL 22740917, *5 (N.D.W. Va. Aug. 27, 2003)
(citing Miller v. SMS Schloemann-Siemag, Inc., 203 F.Supp.2d 633,
636, 640 (S.D.W. Va. 2002) (plaintiff had sufficiently alleged a
claim of outrage where the defendant's offer to transport her
severely injured husband to a medical facility was conditioned on
her promise not to treat the transport as an admission of liability
for his injuries); Bell v. Nat'l Republican Congressional Comm.,
187 F.Supp.2d 605, 618 (S.D.W. Va. 2002) (false labeling of the
plaintiff as a child molester and rapist may reasonably be
considered outrageous)). Finally, "[w]hether conduct may reasonably
be considered outrageous is a legal question, and whether conduct
is in fact outrageous is a question for jury determination." Syl.
pt. 4, Travis, 504 S.E.2d at 421.

Because the Court has dismissed the Warners' claims of outrage
against the City, their broad accusations of outrageous conduct by
"the City" are no longer relevant. Instead, in order to defeat the
defendants' motion, the Warners must establish that the conduct of
each individual defendant rises to the level of the unprecedented
and extreme misconduct recognized in Travis and the Restatement
(2d).

20

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

### A. City Manager Boroff

Although the evidence of record establishes that Boroff, the City Manager, refused to inspect Mountaineer Court personally (dkt. no. 114 at 11), recommended Mark Nesselroad to serve as receiver for Mountaineer Court (dkt. no. 130 at 8-9), deferred to the expertise of his code enforcement officers (dkt. no. 130 at 25), and failed to recall meeting with the Warners (dkt. no. 130 at 6-7), such conduct cannot reasonably be characterized as outrageous under <u>Travis</u> and the Restatement (2d). While the Warners may not agree with Boroff's decisions or his recollection, his conduct simply was not "utterly intolerable in a civilized community." Rst. (2d) Torts § 46(1), comment (d). Indeed, even if, as the Warners allege, Boroff did not intend to help them or wish to cooperate with them, that would not render his conduct outrageous. <u>See Courtney v. Courtney</u>, 413 S.E.2d 418, 423 (W. Va. 1991) ("[C]onduct that is merely annoying, <u>harmful of one's rights or expectations</u>, uncivil, <u>mean-spirited</u>, or negligent does not constitute outrageous conduct." (emphasis added)). As a matter of law, therefore, the Court concludes that Boroff's conduct was not outrageous.

MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]

### B. Fire Chief Fetty

The Warners accuse Fetty of using Humphries' retirement as an excuse to wage a campaign of retaliation against them (dkt. no. 114 at 6), of being ignorant about the extent of the remediation needed at Mountaineer Court, of deferring to his subordinates (dkt. no. 125 at 5), and of refusing to inspect Mountaineer Court personally (dkt. no. 114 at 11).[4] These allegations, like those against Boroff, cannot reasonably be characterized as "outrageous." While the Warners may disagree with Fetty's management style and his refusal to inspect Mountaineer Court, such conduct does not rise to the level of "unprecedented and extreme misconduct" the tort of outrage is intended to punish. Tanner, 461 S.E.2d at 157. Even if the Court were to credit Andrew Warner's unsupported deposition testimony that Fetty's actions were driven by a desire for retaliation, malice alone does not make his conduct outrageous. Rst. (2d) Torts § 46(1), comment (d); Gordon v. Gestetner Corp., 995 F.2d 1062, *2 (4th Cir. 1993) (under Virginia law, which is

---

[4] The Warners assert that Fetty was also unaware of a letter sent to the City of Morgantown from the Warners' attorney complaining of overzealous code enforcement at Mountaineer Court, and unaware of the reason why the Warners were not granted an extension to complete renovations in late December 2008. In support, the Warners cite to pages of Fetty's deposition that are not a part of the record, so the Court will not consider these allegations at summary judgment.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

also based on the Rst. (2d) formulation, "intentional, malicious, or criminal conduct is not sufficient"); <u>Shrader v. Siana & Vaughan, LLP</u>, No. 03-3510, 2005 WL 975411 (E.D.Pa. April 25, 2005) (quoting comment (d), and holding that wrongful prosecution of a civil action is not outrageous); <u>Northrup v. Farmland Ind., Inc.</u>, 372 N.W.2d 193, 198 (Iowa 1985) (highlighting comment (d)). In short, the Court finds, as a matter of law, that Fetty's conduct is not "outrageous."

### C. Chief Fire Marshal Tennant

The Warners contend that Tennant maliciously reinterpreted sprinkler requirements in order to delay the opening of The Augusta, stated he did not think the Warners would complete The Augusta, disliked landlords, told a meeting of the fire captains that The Augusta should never have been built, and wrote a memo to the City Manager requesting "[a] letter from the bank/financial institution documenting their acquisition of control" before extending repair deadlines at Mountaineer Court.[5]

---

[5] The Warners also state that Tennant testified in his deposition that he would have granted the Warners an extension to complete repairs had Dempsey sent additional timeliness by December 26, 2008, a day on which City offices were closed. The cited portion of Tennant's deposition is not attached to the Warners' response, however.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]

The first three instances of alleged "outrageous conduct" by Tennant are not supported by evidence in the record.[6] Furthermore, Tennant's issuance of a memo demanding a letter from the Warners' bank is not, in and of itself, outrageous. Even if the memo can be interpreted to indicate Tennant's desire to oust the Warners from control of Mountaineer Court, at worst, such desire is "harmful of [the Warner's] rights and expectations," but does not rise to the required level of outrageousness. Courtney, 413 S.E.2d at 423. And, even if the memo could be read as indicating that Tennant intended to cause the individual Warners emotional distress, such intent will not transform everyday conduct, such as writing a memorandum, into outrageous conduct. See Rst. (2d) Torts § 46(1), comment (d) (stating that an intent to cause emotional distress is insufficient to find outrageous conduct).

_____

6    The portions of the record cited by the Warners do not support their allegation that Tennant "maliciously reinterpreted" sprinkler requirements at The Augusta. (Dkt. No. 112 at 3) (stating that the City required the Warners to "add-on" sprinklers in The Augusta's crawl-space); (Dkt. No. 117) (e-mail from Dempsey that does not mention "sprinklers"); (Dkt. No. 114 at 6)(generally referring to "add-ons" at The Augusta). The allegation that Tennant stated the Warners would not complete The Augusta is unsupported by the record, as well. Tennant's dislike of landlords is likewise only supported only by inadmissible hearsay – a letter from a Morgantown landlord to Boroff written in 2007. (Dkt. No. 145 at 10).

Finally, Tennant's professional opinion that The Augusta did not meet fire code standards cannot reasonably be called outrageous simply because it tends to cut against the Warners' interests. See Courtney, 413 S.E.2d at 423; Don King Prod., Inc. v. Douglas, 742 F.Supp. 778, 785 (S.D.N.Y. 1990) ("in the professional or employment context the edges may be particularly rough" and "only in the most extreme and outrageous case does a cause of action for intentionally hurt feelings lie"). As a matter of law, therefore, Tennant's conduct was not "outrageous."

### D. Deputy Chief Fire Marshal Pickenpaugh

While Pickenpaugh's actions loom large in the story of the two condemnations of Mountaineer Court, his conduct was not outrageous. The Warners allege that Pickenpaugh acted outrageously when he condemned Mountaineer Court on July 11, 2008, giving them twenty-four days, and not the required thirty days, to correct fire code violations. They further contend that he failed to respond to Dempsey's requests for information, although he readily provided such information to the receiver. He also failed to explain how a certificate of occupancy was granted to the receiver even though stair towers at Mountaineer Court still violated the city building codes, condemned Mountaineer Court on July 11, 2008, without the

approval of his superiors, condemned Mountaineer Court in December 2008 due to missed construction deadlines, in spite of the fact that work on the building was progressing, and faxed a copy of the December 2008 condemnation order to Fifth/Third Bank's attorneys.

Even with the support found in the record for these allegations, none of Pickenpaugh's actions amounts to outrageous conduct despite how much they ultimately may have harmed the Warners' interests. Courtney, 413 S.E.2d at 423. Moreover, even if Pickenpaugh did condemn Mountaineer Court in violation of West Virginia Code § 29-3-16, such an illegal act is not necessarily outrageous. Preston v. Atmel Corp., 560 F.Supp.2d 1035, 1040 (D. Colo. 2008) ("Conduct that could be illegal or that some might consider reprehensible is not necessarily actionable."); Rst. (2d) Torts § 46(1), comment (d) ("It has not been enough that the defendant has acted with an intent which is tortious or even criminal . . . ."); 86 CJS Torts § 74 (2012) ("An act is not necessarily outrageous merely because it is illegal . . . ."). Assuming Pickenpaugh did violate West Virginia law, he did so by condemning Mountaineer Court only twenty-four days after citing the complex for violations, rather than the statutorily-required thirty

– a difference of only six days. Such a small span of time can hardly be termed "outrageous."

Further, Pickenpaugh's status as a "repeat player" in the series of enforcement actions at Mountaineer Court does not necessarily elevate his actions to the requisite level of outrageousness. For example, applying the Restatement (2d) formulation of outrage, the Sixth Circuit has held that a landowner's repeated interference with easement holders' rights of access, including "a continuing course of confrontation and harassment," was not outrageous. <u>Winkler v. Petersilie</u>, 124 F. App'x 925, 934 (6th Cir. 2005). Pickenpaugh's actions, which the Warners surely considered a "continuing course of confrontation and harassment," likewise reasonably cannot be labeled "outrageous."

### E. Chief Engineer Hough

The Warners contend that Hough's failure to explain why fire officials condemned Mountaineer Court in July 2008, as well as her statements to Zeigler during their meeting on December 19, 2008, were outrageous. That Hough, who oversees enforcement of building codes in Morgantown, lacked an explanation as to why a fire official condemned Mountaineer Court certainly does not cross all "possible bounds of decency." Rst. (2d) Torts § 46(1), comment (d).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

Furthermore, even if she did tell Zeigler she did not want the
Warners in control of improvements at Mountaineer Court,[7] such a
statement is not the type of "unprecedented and extreme misconduct"
targeted by the tort of outrage. <u>Tanner</u>, 461 S.E.2d at 157. Hough
did not ridicule or verbally abuse the Warners. <u>See</u> <u>Hatfield v.
Health Management Assoc. of W. Va.</u>, 672 S.E.2d 395, 404 (W. Va.
2008) (firing of at-will employee was not outrageous where employer
did not "ridicule, harass, or verbally abuse the appellant, nor
make any derogatory or inappropriate statements with respect to
either her employment or her termination"). Nor was her conduct,
even if "mean-spirited" or "harmful of one's rights or
expectations," outrageous. <u>Courtney</u>, 413 S.E.2d at 423. As a matter
of law, therefore, the Warners cannot claim that Hough's conduct
was outrageous.

### F. Building Code Enforcement Officer Friend

The Warners maintain that Friend acted outrageously when he
issued a stop work order on December 8, 2008, later waived the
splice plate requirement for Nesselroad, which he refused to do for

---

[7]    In her deposition, Zeigler testified not that Hough had stated she
no longer wanted the Warners in control of Mountaineer Court, but that
Zeigler herself had left the meeting with Hough with the impression that
officials of the City of Morgantown "wanted the improvements [at
Mountaineer Court] in the hands of someone else." (Dkt. No. 124 at 7).

the Warners (dkt. no. 137 at 4), and could not explain why Mountaineer Court had been condemned in July 2008.

As with the allegations involving Hough, Friend's failure to explain the actions of another does not cross all "possible bounds of decency." Rst. (2d) Torts § 46(1), comment (d). Friend, after all, is a building code enforcement officer and it was Deputy Fire Marshal Pickenpaugh who condemned Mountaineer Court in July, 2008 for violations of the fire code. See supra.

Moreover, assuming the Warners' contention that Friend issued a stop work order in December 2008 on pretextual grounds is true, such conduct is not, as a matter of law, outrageous. Simply put, a mistake is not outrageous. Brown v. City of Fairmont, 655 S.E.2d 563, 569 (W. Va. 2007) (improper disbursement of pension funds, though ill-advised or the product of poor judgment, was not atrocious, intolerable, or outrageous).

Finally, assuming that Friend's discretion would not have permitted him to rely on the representation of the receiver's engineer that the splice plates were unnecessary, an ill-advised action is also not outrageous. Id. Indeed, even if Friend discriminated against the Warners intentionally or maliciously, such an intent does not elevate his otherwise mundane conduct to

the requisite level of outrageousness. <u>See</u> <u>Gordon</u>, 995 F.2d at *2. (under the Rst. (2d), conduct that is "intentional, malicious, or criminal" is not sufficiently outrageous). In short, the Warners have pointed to no conduct that could reasonably be labeled "outrageous."

### G. Defendants Poling, Terry Rhinehart ("Rhinehart"), Jason Quinn ("Quinn"), and Michael Stone ("Stone")

The Warners do not raise any disputed issue of material fact as to the outrageous nature of the conduct of the remaining defendants, Poling, Rhinehart, Quinn, and Stone. These defendants, therefore, are entitled to judgment as a matter of law based on the failure of the Warners to state a legally cognizable claim of outrage against them. Fed. R. Civ. P. 56(c).[8]

In summary, the Warners have failed to state a claim regarding the outrageous nature of the conduct of any of the individual

---

[8]    In fact, Quinn is not mentioned at all in the Warners' response to the defendants' motion for summary judgment, and Stone is mentioned only once. Rhinehart is not discussed in the response, either. Based on the record, the only action he took in the matter was to lift the July 2008 condemnation order on August 7, 2008. Beyond inspecting Mountaineer Court three times in February and March 2008, the Warners point to no record evidence that Poling's conduct was outrageous.

defendants. These defendants, therefore, are entitled to judgment as a matter of law as to this claim.[9]

### H. Concerted Action and Official Conduct

The Warners advance two theories as to why the individual defendants' conduct, when considered in combination, should support a recovery for outrage and save their case. First, they claim the defendants acted deliberately, with a shared intent to deprive them of Mountaineer Court and to drive them into bankruptcy. Second, they contend that the defendants abused their official power.

Some courts have held that the tort of outrage may provide a remedy "where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation." Nader v. General Motors Corp., 255 N.E.2d 765, 770 (N.Y. 1970). In this case, however, even when the alleged conduct of the individual defendants is considered in combination, it does not rise to the

---

[9]     Further, the Warners do not specify at whom the individual defendants directed their allegedly outrageous conduct. For example, they do not specify which brother, Andrew, Kristian, Monroe, or Benjamin, was harmed when Pickenpaugh acted "outrageously" by condemning Mountaineer Court on December 29, 2008. The Warner brothers are not a legal "unit", with harm to one harming the others, or harm to the "unit" automatically harming the individual brothers. Thus, the individual Warners also fail to raise a genuine issue of material fact as to whether "the actions of the [individual] defendant(s) caused the [individual] plaintiff(s) to suffer emotional distress," Travis, 504 S.E.2d at 425, and summary judgment for the individual defendants is appropriate on that ground, as well.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

requisite level of outrageousness. Fundamentally, the Warners fail

to point to a single act taken by an individual defendant that

rises to the requisite level of outrageousness. See <u>Kirwin v. N.Y.</u>

<u>State Off. of Mental Health</u>, 665 F.Supp. 1034, 1040 (E.D.N.Y. 1987)

(allegations of a "veritable campaign of harassment" composed of

"insults, indignities, annoyances and petty oppressions" does not

constitute outrageous conduct). Nor have they provided a scintilla

of proof that the series of enforcement actions about which they

complain were part of a deliberate campaign by the individual

defendants to ruin them.[10] <u>Kovich v. Manhattan Life Ins. Co.</u>, 640

F.Supp. 134, 137 (S.D.N.Y. 1986) (holding that, even when

considered in combination, allegations that employer forged

plaintiff's time records and told her she would be "black-balled"

in the insurance industry did not arise to an outrageous campaign).

Therefore, absent any outrageous conduct, or even a scintilla of

evidence of a deliberate campaign to ruin the Warners, the actions

---

[10]     The Warners imply that City officials targeted Warner-owned
properties for enforcement to enable WVU to purchase the properties, but
they offer no support for these allegations. (Dkt. No. 111 at 3) (bald
statement that "[m]any City Officials are intimately associated with the
University"). They also intimate that it was the general practice by the
City to "squeeze landlords." (Dkt. No. 114 at 4,6). That unsupported
allegation, however, does not establish a deliberate campaign by the
individual defendants to ruin the individual plaintiffs, even assuming
such a deliberate campaign would be considered outrageous under <u>Travis</u>
and the Restatement (2d).

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

of the individual defendants, when considered in their totality, do not rise to the requisite level of outrageousness.

Indeed, the record counsels against any such inference. News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (inferences drawn in favor of the nonmoving party must "flow rationally from the underlying facts" (citation omitted)); JKC Holding Co. LLC, 234 F.3d at 465 "inferences must fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture.") (internal citations omitted). For example, it was a fire official not named in this suit who first prompted Pickenpaugh to inspect Mountaineer Court on June 17, 2008. (Dkt. No. 105-2 at 69, 75). Similarly, it was another inspector, Forbes, also not a party to this suit, who cited Mountaineer Court for rotted wooden components of the building's exterior walkways. (Dkt. No. 105-2 at 34). Notably, that particular defect, which became such a hotly contested issue later on during the remediation, originated in an inspection conducted by a City official not a party to this litigation. Finally, even the Warners' own characterization of the record emphasizes a lack of coordination among the individual defendants. All this strongly cuts against any inference that the

nine individual defendants acted in combination as part of a far-reaching, long-term campaign to destroy the Warners.

The Warners also argue that the defendants acted outrageously because they abused their official power. <u>See</u> Rst. (2d) § 46, cmt. (e) ("The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests."). While the Restatement (2d) recognizes that an abuse of official power can be outrageous, the abuse still must be "extreme," and outrage will not lie where the conduct is only "mere insults, indignities, or annoyances." <u>Id.</u> Moreover, "not every exercise of power or authority is wrongful." Dan B. Dobbs, THE LAW OF TORTS 827 (2000). For example, while a plaintiff who is charged with a crime may feel deep distress, the investigating officers are not liable in tort for that distress. <u>Id.</u> Likewise, while the Warners may feel deep distress at the outcome of the series of building and fire code enforcement actions taken by the individual defendants, it does not necessarily follow that the defendants' actions were outrageous. <u>See</u> <u>Hamaker v. Ivy</u>, 51 F.3d 108, 111 (8th Cir. 1995) (reasoning that the law affords other remedies for official misconduct, and "conduct that is

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

otherwise not extreme and outrageous [does not] become[] extreme and outrageous only because the actors were [public] officials"). In sum, the Warners' argument – that the defendants' official positions elevate their conduct to the requisite level of outrageousness – fails.

At bottom, the Warners want the Court to conclude that the <u>result</u> of the enforcement actions undertaken by the individual defendants was outrageous, not the enforcement actions themselves. Under <u>Travis</u> and its progeny, this is the wrong inquiry. Even if one might be inclined to sympathize with what has befallen the Warners since the loss of Mountaineer Court, such hardship, absent outrageous conduct, simply does not satisfy the elements of outrage.[11]

---

[11]     The defendants also argue that, under <u>Smith Setzer & Sons, Inc. v. S.C. Procurement Rvw. Panel</u>, 20 F.3d 1311, 1317 (4th Cir. 1994), the Warners lack standing to assert a claim of outrage because their injuries resulted from their membership in the failed, Warner-controlled limited liability corporations, and not the defendants' actions. The Court, however, will not address this issue because the Warners' failure to raise a genuine issue of material fact as to the outrageousness of the defendants' conduct is fatal to their claim.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DKT. NO. 105]**

**V.**

In conclusion, for the reasons stated above, the Court:

1.    **GRANTS** the defendants' motion for summary judgment (dkt. no. 105) as to the plaintiffs' remaining claims;

2.    **DISMISSES** the individual defendants **WITH PREJUDICE**;

3.    **GRANTS** the plaintiffs' oral motion to dismiss the defendants' Motion to Alter Judgment, Motion to Expunge Lis Pendens (dkt. no. 109); and

4.    **ORDERS** the case **STRICKEN** from the Court's docket.

Pursuant to Fed. R. Civ. P. 58, the Court **DIRECTS** the Clerk of Court to enter a separate judgment order and to transmit copies of both orders to counsel of record.

DATED: February 1, 2013.


/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE